## In re Estate of Nancy B. McIntosh.

### O. C. Brown, Appellee, v. Evan B. Dowell, Administrator, Appellee, et al., Interveners and Appellants.

**EXECUTORS AND ADMINISTRATORS:** Appointment—Compensation—Contract. A testator, in so far as heirs are concerned, may, *by contract,* validly direct who shall act as executor of testator's will and what compensation said executor shall receive from the estate, even though such compensation is in excess of the statutory allowance.

**EXECUTORS AND ADMINISTRATORS:** Appointment—Validity. Evidence reviewed, and held not to show such conduct on the part of an executor as to affect the validity of his appointment.

**WILLS:** Testamentary Dispositions—Contract Appointing Executor. A contract between testator and claimant, by which claimant was appointed executor of testator's estate, and his compensation was fixed, is not testamentary.

**CONTRACTS:** Performance—Death of Party—Effect. Death terminates agency, but not contract. Therefore, *held* that a contract by which one agreed to act as attorney for another, and also to act as executor of such other for a stated compensation, was enforceable against the estate of such other party.

**EXECUTORS AND ADMINISTRATORS:** Allowance of Claims— Nature of Proceedings—Equitable Defenses—Appeal. Proceedings to establish claims in probate are at law, and remain so on appeal, even though an equitable defense, i. e., estoppel, is pleaded.

**EXECUTORS AND ADMINISTRATORS:** Allowance of Claims— Ante Mortem Contract With Executor—Concealment. Evidence reviewed, and held sufficient to sustain the finding of the probate court that an *ante mortem* contract between testator and her attorney or agent was fair and just, and that claimant was guilty of no such concealment of such contract as to estop him from claiming thereunder.

**EVIDENCE:** Opinion Evidence—Value of Services—Immateriality Under Contract Which Specifies Compensation. Evidence of the value of services is wholly immaterial under a valid contract which specifically provides what compensation shall be paid.

*Appeal from Warren District Court.*—J. H. APPLEGATE, Judge.

SEPTEMBER 23, 1916.

REHEARING DENIED DECEMBER 14, 1917.

PROCEEDING in probate at law for the allowance of a claim filed by plaintiff, Brown, against the estate of Nancy B. McIntosh. An allowance was granted, and the interveners appeal.—*Affirmed.*

*O. M. Brockett,* for appellants.

*Berry & Watson,* for appellees.

SALINGER, J.—On the 24th day of May, 1909, Nancy B. McIntosh, now deceased, executed her last will. Appellee Brown, an attorney, drew that will. These two signed a paper dated May 24, 1909, as follows:

"Indianola, Iowa, May 24, 1909.

"It is hereby understood and agreed that O. C. Brown will accept the appointment as executor of my last will this day made and that he is to have and accept five per cent of my estate as full compensation for all services he shall render or perform as such executor, and shall act as his own attorney therein and his compensation shall also be in full of all his services as such attorney, and this employment to be binding on my estate, my heirs and devisees.

"N. B. McIntosh,

"O. C. Brown.

"Witness to Signatures

"W. G. Stanley.

"J. N. Weldin."

On the 25th day of June, 1909, these two made the following writing:

"This memorandum of agreement is to witness that Whereas, O. C. Brown has rendered me valuable assistance in the management of my farm during the past seven years, and has attended to renting the same for me, and has attended to making the repairs on the same and collecting the rents from year to year, and has advised me during said time in all business affairs only a part of which he has been paid for, and whereas, it is necessary that I retain him in my employ as my attorney and legal adviser in my affairs and in the management of my farm as heretofore, and whereas, I have executed my last will and have appointed said O. C. Brown my executor therein, now therefore, in settlement for his said services and in consideration for said future services and also in consideration of his acting as said executor of my last will, I hereby promise and agree for myself, my heirs and executor that he shall have five per cent of all property of which I may die seized, the same to be paid to him in cash, six months after the date of my death, and the said O. C. Brown is not to charge any additional amount as commission as such executor's services.

"Signed June 25, 1909.        Nancy B. McIntosh.

"Accepted June 25th, 1909.        O. C. Brown."

The claim sustained by the trial court rests on this last writing. Allowance was made to appellee according to said last writing, and is appealed from.

The appellants present a number of assignments attacking the validity and enforceability of the writing, and urge there was such conduct on part of appellee that he should recover neither under the writing nor at all.

II.    Interveners say the contract attempts to provide compensation for a public officer, and is for that reason contrary to public policy and void, and is also void because it provides for more pay than the stat-

1. EXECUTORS AND ADMINISTRATORS: appointment: compensation: contract.

ute allows. Neither *Anderson v. Sabin*, 132 Iowa 507, nor *State v. Spaulding*, 102 Iowa 639, nor 29 Cyc. 1361 et seq., sustain such a contention. Moreover, appellant practically abandons it in reply.

2. EXECUTORS AND ADMINIS-TRATORS: ap-pointment: validity.

III. It is said Brown was guilty of fraudulent concealments which should estop him to receive any compensation, and, to a certainty, from receiving compensation under the contract. One claim in testimony is that he concealed the will which appointed him executor, and that by such concealment the interveners were prevented from interfering with his acting, and saving the estate from paying him. The evidence is that the husband of one of the interveners says the family and Brown did not, to his knowledge, discuss anything at the funeral about Brown's being nominated as executor, and that witness remembers nothing that Brown said about being thus nominated. The wife of this witness says that, on the day of the funeral, Brown read but a part of the will, that which dealt with funeral expenses, and as to the chapter O. E. S. burying her. Next, that she doesn't remember whether he made any statement on whether he would probate the will and procure his own appointment. Next, that Brown read her and her sister the will at the funeral, and that she was advised then the mother had requested in her will that Brown be appointed executor. Next, that Brown read it in her hearing as soon as witness came to Indianola after her mother's death. The will was filed three days after the death. When the attention of the witness was called to this, she says, "That was before I saw it, then." Brown says the daughters knew he was going to present the will for probate, because he talked with them about it, but doesn't remember whether he had any discussion with them on the carrying out the request in the will that he be made executor. He adds the will was probated in open court;

that then the attention of the judge was called to the nomination made in the will, and an order entered appointing him; and that, while none of the interveners were present then, they had seen the will before that. We think the appointment is valid.

IV. Because, according to 18 Cyc., page 1157, "a personal representative may agree with the persons interested in the settlement of the estate as to the compensation he shall receive, and he is bound by an agreement to accept a less sum than the statutory compensation; while, on the other hand, he may enforce an agreement allowing him a sum in excess of that allowed by statute," it is argued decedent may *not* so agree in her lifetime, and thereby bind her estate. The estate may be so bound if it be done by will. 18 Cyc. 1143. Why may it not be effected by contract? The owner of property may give it away, and, if the donor be competent, and there be no fraud or coercion, the heirs may not complain. Much less have they the right to insist that the property must come to them free from contract obligations of the owner, and without check on the method and expense of administration. We hold that contract, as well as will, may, as to heirs, direct who shall be executor, what he shall be paid, and that the estate shall pay him.

V. It is said the writing is not a contract, but a testament, executed without the necessary formalities; because: (1) The services were not to be rendered until after the death of testatrix, and as to them the contract was not to become effective until after her death; (2) she incurred no personal liability and created no lien upon any of her property by any of the provisions of the instrument, and plaintiff holds no covenant from anybody to pay him anything for such services; (3) the contract attempted to provide, together with other matters, that plaintiff should act as executor, administer her estate as

3. WILLS: testamentary dispositions: contract appointing executor.

such, act as attorney for himself as such executor, and to charge her estate with an obligation to pay him for such services probably twenty times as much as would have been allowed in the absence of such contract, or similar provision in the will. It is argued that the writing on its face presents all the elements of a testamentary disposition; that it declares the present will of the maker as to disposal of property after death, without attempting to declare or create any rights therein prior to such event, and that this is settled by *Templeton v. Butler*, (Wis.) 94 N. W. 306. This is based upon the fact that the instrument considered in the *Templeton* case contains no word of promise or agreement, nor anything to indicate that any conception of contract between the parties was present in their minds or in that of the draftsman, and that the words "I certify," used, seem quite clearly to indicate absence of idea of dealing contractually; that instead, it indicates a purpose to proclaim to whom it may concern that declarant has a certain intention. It seems to have been a case of claiming that notes and debts should remain existent during life only. The words were:

"This is to certify that the notes held by me against A. L. Butler shall be null and void after my death, and noncollectible."

The case went off on the point that the only consideration for the claimed promise was that Butler would pay interest until the death of his father. Another defense was that it was an advancement to the son. It is said the absence of promise words is significant and may probably be controlling, "unless something in the context or circumstances shows a mental attitude differing from the expressions used." It is significant the *Templeton* case holds that, though a document may be merely testamentary, is revoked, and is, therefore, ineffectual as a will, "still it does not exclude the possibility that the parties in fact

made a binding agreement upon sufficient consideration, to the effect that the indebtedness evidenced by these notes should become cancelled upon the death of their owner." The writing does not fail for being testamentary.

VI. This is coupled with the claim

4. CONTRACTS:
performance:
death of
party: effect.

that, at any rate, the testatrix could not create an agency that would survive her death. The position is sound, but irrelevant. Death does terminate an agency. But it does not terminate contracts. If this contract is otherwise valid and enforceable, it is not made otherwise because work under it was to be done after decease of one party to it, or that payment was to be made then and not till then. As to what was done after the death, Brown was not acting as agent of decedent.

VII. There is evidence that Brown and decedent were on friendly terms, that there was some fraternal relation, and that their dealings for many years had established Brown in the confidence of decedent. It is urged the court erred in holding that the relation of attorney and client had terminated when the contract in suit was entered into. All said is not very material, no matter how true. The court did find that the relation of attorney and client no longer existed. The only effect of a subsisting relation of attorney and client is to put claimant to the proof of fair dealing. The relation found by the court—principal and agent—does as much, and plaintiff concedes he has such burden.

It being settled that plaintiff has the

5. EXECUTORS
AND ADMINIS-
TRATORS: al-
lowance of
claims: nature
of proceed-
ings: equit-
able defenses:
appeal.

burden of proof, the question is whether he has discharged it. This brings on a controversy over the standard by which the evidence shall be weighed. During some stage of this litigation, the interveners brought an injunction suit which reached this court. It is entitled *McIntosh v. Brown,* and reported on page 41 of 159 Iowa.

It was a suit to enjoin the enforcement of this claim, and in it, it was asserted that the stipulated compensation is greatly in excess of the reasonable value of the services rendered and fees to which defendant would be entitled as executor; that he concealed his contract from plaintiffs until same was filed, and thereby obviated objections to his appointment which they would have interposed; that the contract is inequitable and voidable, if not void, because it was concealed, as stated, and was procured of decedent when their relation was attorney and client, and because it stipulates for compensation other than that prescribed by law, and for an excessive compensation. The appellant presents that this case irrevocably settles as the law of the case that interveners are entitled to have the benefit of the presumptions and principles of equity involved in the merits of this controversy which they would have if the proceeding were being tried by the equitable method. They say that, before the decision of said case, appellant was of opinion that interveners could not have the benefit of said rules and presumptions, and, therefore, sought to enjoin the prosecution of the claim, and a decree cancelling the contract; but that, on appeal, it was settled that all this might be done by way of defense to the claim in the probate court.

Upon these premises it is urged that as, throughout the litigation, plaintiff has stood upon his claim as originally filed, and has challenged the defenders to join issue to litigate the sufficiency thereof, and as they have accepted the challenge and acted thereon, plaintiff is estopped to now materially alter or shift his position or mend his hold. The opinion in the *McIntosh* case holds just this, and no more: Proceedings to establish claims are at law; though proceedings in probate have distinct attributes of their own, they are had in the same court, the law court; that, for self-evident reasons of comity and orderly procedure, one

court will not restrain another which has complete jurisdiction of the matters in controversy and can grant adequate relief; that this is true of an action brought in probate court; that every defense pleaded for equitable relief may be set up as defense to the claim at law; that the same presumptions and rules of evidence will obtain in one as will in the other; that it is not pretended the special administrator will not interpose these defenses, and should he fail to, he can be compelled to; and that no reason appears for stopping the adjudication of the rights of the parties, notwithstanding the relationship of attorney and client, in the probate court which had first acquired jurisdiction of the subject matter. This is not a holding that the defenses here made turn the proceedings in probate court into an equity suit for any purpose. On the contrary, it is a holding that equity will not interfere because these defenses may be fully asserted at law. There is no estoppel by adjudication or otherwise which changes that the proceeding always was and has remained a proceeding at law—and the review on this appeal will be that accorded judgments and orders at law. In them, when tried to the court, the findings of the court on questions of fact have the standing of a verdict. To overrule them, there must be such want of testimony as to raise the presumption they are not the unprejudiced and honest exercise of the judicial function of the court. Such finding will not be disturbed on appeal where the evidence conflicts—will not be disturbed though, if we were trying the case for ourselves, we might reach a different conclusion, or unless the findings so completely lack support as to indicate that it was the result of passion or prejudice. And it is peculiarly the province of the trier who saw the witnesses to solve questions involving the charge of fraud. This alone settles that the judgment on the questions of fact may not be disturbed unless there is what amounts to a failure of proof. Finally, appellant, in

reply, concedes about that much. He says that the presump-
tions indulged for the support of verdicts are academic,
because, so far as appellant makes any complaint, it is
based upon the claim that the finding and judgment are
wholly without support in the evidence, and in some re-
spects in direct conflict with undisputed evidence.

VIII. The next branch is assertion
that concealment was practiced as to the
existence of the contract with Brown, and
as to its terms. The first point made is
through the testimony of Mrs. Wright that,
though her mother and she were friendly,

6. EXECUTORS
AND ADMINIS-
TRATORS : al-
lowance of
claims : *ante
mortem* con-
tract with
executor : con-
cealment.

and the mother had opportunity to talk freely about her bus-
iness, she never said anything about any settlement or con-
tract with Brown, and said nothing about his work, except
that he had a certain suit to straighten out the title to a
small tract of land. The husband of Mrs. Wright testifies
Brown said nothing at the funeral about this contract
or having one, but that, a long time afterwards, when they
were discussing various matters, including the status of the
Sadler claim, and as it neared train time and witness rose
to go, and was standing near the door of the office, Brown
finally said, "I have a contract." Witness believes he said,
"a written contract;" that he had a written contract with
Mrs. McIntosh to have five per cent of the estate. Witness
did not ask him to show the contract, nor say anything
in response. Mrs. Wright agrees with her husband that
Brown said nothing at the funeral about having any con-
tract to look after the settlement of the estate. She re-
members that, in the summer of 1910, she asked him what
he was getting out of it, because she wanted to know where
she could get the money to settle. This was the first time
they were out after the funeral. She thinks he made no
very definite answer, except to say that it would not be
very much. At one time when she was talking with him

about claims, he made some notation, but did not note down anything for his own claim nor say anything about what it was going to be, and she said nothing to him about it. She never had any talk with him about his contract until on September 13, 1911, when she again asked him for the amount of money. She says that, at this time, he seemed to understand her, because he dodged behind his desk and fumbled around, and said, "You know, of course, that I had a contract for five per cent of that estate." She did not tell him whether she knew or not, but asked him to give her a copy. He fumbled around awhile, and then it was getting so near train time that she had to go or miss her train, and he promised to make a copy, to make copies, but never did so. She didn't see the contract at the time. She continues, she asked him repeatedly about claims, in order to know the money that would be necessary to clear up everything, and at no time did he ever mention his own contract. Upon being asked by the court why she didn't ask him about it, in view of the fact that her husband had told her that Brown claimed five per cent of the estate, she answered she thought Brown might tell her when she asked him repeatedly about it. First time she saw the contract was after September, 1911, when Brockett came to settle with Brown.

Akin is testimony that interveners went through the papers Brown turned over to them, but found no statement of what decedent owed Brown, and no itemized bills; that, when Brockett came to see Brown, and he asked him to open his books and show his charges, he didn't do it, and said some were not on the books; that decedent used to come into the office and talk to him a great deal for which he did not charge; and he said nothing as to what the contract was for, or what money he had paid decedent or been paid by her.

There is a further claim that there was an affirmative

concealment of Brown's contract in that, when Mrs. Wright wrote him for "a list of the claims to date against the estate," he sent her the list of claims filed, taken from the clerk's register, but did not include his own claim in the statement. The court could find on the evidence, and no doubt did, that Brown did not understand that the request covered his own claim, and that Mrs. Wright knew that Brown claimed under his contract when she wrote for the list of claims, and therefore was not including the Brown contract in her request.

### 2.

There is a contention that Brown urged the selling of the farm repeatedly, and assigned as a reason that such sale would give him something to show "for the $1,250." This is not very intelligible, and has the appearance of being a mere makeweight, an attempt to give color to a theory of concealment in some way. Brown fully denies having made such a request, and says the only talk of selling was on suggestion by some of the interveners, after learning how much there was to pay, that it might be well to sell some 80 acres of the farm, and that he concurred in this suggestion.

### 3.

Something is claimed for the alleged fact that Brown refused to take his books before a named judge, in order to see what should be done, it being said that, if he did so, he would be paid without further trouble. We fail to see how it is material to this controversy whether this did or did not occur. Moreover, the court could well find that this proposal was made in the course of a quarrel caused by the belief of Brown that he was being charged with actual fraud; that it was suggested to him it was disagreeable for a lawyer to have a lawsuit with his client,

and he could avoid it by abandoning a large or substantial part of his claim; that he consulted his wife, and she told him such compromise was an admission there was something wrong or shady about the contract; that he looked at it the same way, and for that reason, and because the others had prepared the law and he had not, he wanted to try it out.

IX.    Appellant says that, in the circumstances, it was the duty of Brown to tell his client just what a disinterested attorney should have told her, had she sought his advice on making this contract with Brown, and had he met this standard, he would have told decedent certain things enumerated by appellant's argument. Appellee responds that, as to compensation, attorney and client deal at arm's length, and this is so after the relation has ceased, and the attorney need not show, as a condition to enforcing such contract, that it is fair or reasonable, citing *Shirk v. Neible,* (Ind.) 83 Am. St. 150, and cases in the note to same on page 159; *Dockery v. McLellan,* (Wis.) 67 N. W. 733.

We may assume the duty is that which the appellant claims, but it does not follow that what is therefore to be communicated must be brought home to the client by words spoken by the lawyer giving such information in those very terms. It suffices that the trial court could find, and found from the evidence, that all which is essential was known to the client. The testimony is undisputed that Mrs. McIntosh had more than average intelligence, understanding and positiveness. It appears the value of her estate was discussed with her, and a computation made of what the proposed fee would be on a five per cent basis; that she initiated the negotiations and urged them, and discussed them with others in advance; said that such an arrangement was desirable, and she intended to seek one; that she gave reasons resting on her own convenience and advan-

tage for making such contract; that the court could find there were enough past services to be paid for and enough future services, both in the lifetime and thereafter, likely to be needed, to make the amount stipulated for and payable after death reasonable; that decedent herself made the point of wanting the advantage that all payment to be made should be limited in advance as to amount, and should not be a burden to her while living. She fully appreciated the terms of the contract that she had made, spoke of it time and again after it was made, and with satisfaction, and when away from Brown. She declined to make payment by note, when it was suggested, and recalled her experience in the past about the difficulty of paying off debts, and finally either proposed or agreed to a proposal that there should be no payment until after she passed away.

It would be idle, if not impossible, to reproduce all the testimony in this opinion. It suffices to say that, in substance, decedent was fully cognizant of all that is material in what appellants insist she should have been informed; and that, this being so, it matters little whether she got this knowledge by the words that Brown spoke, in some other way, or by a combination of the two sources of information. The essential thing is that, under the rules under which orders at law are given appellate review, we may not here interfere with the finding of the trial court that this is a valid contract.

2.

7. EVIDENCE: opinion evidence: value of services: immateriality under contract which specifies compensation.

We will not discuss what was the reasonable value of the services rendered either before the decease of Mrs. McIntosh or afterwards. On most exhaustive consideration of the voluminous testimony on the point, we find the allowance is not so excessive as

that we could interfere on that ground, on law review. But what is most controlling is that the allowance made rests upon the written contract. Since we find that it was a valid contract, the allowance provided therein is justified, and it becomes immaterial, finally, what the services were in fact worth.

The judgment must be—*Affirmed.*

GAYNOR, C. J., LADD and EVANS, JJ., concur.