## League's Estate

The facts appear from the following extracts from the adjudication of

HOLLAND, P. J., auditing judge.—Henry M. League died October 17, 1937, leaving his will dated February

3, 1937, duly probated on October 19, 1937, upon which letters testamentary were granted to the accountant on the same date. . . .

The inventory and appraisement filed shows a gross estate of $379,540.80, including stock in Quaker City Iron Works, $86,976; listed stocks, $40,987.88, of which $34,450 were pledged with Biddle, Whelen & Co. for a broker's loan, amounting, with interest thereon, to $21,-454.22, sufficient of the listed stocks being sold by the brokers to repay their loan; and also interests in the partnerships, Quaker City Tank Company and Philadelphia Valve Company, $72,089.15. Testator together with his associate previous to his death had taken certain assets from Quaker City Iron Works and for these assets had given their respective notes to the Quaker City Iron Works, the note to said company of testator being, together with interest at the time of his death, $45,535.03. These assets had been put into the said partnerships Quaker City Tank Company and Philadelphia Valve Company. The interests of testator in these partnerships, in stock holdings in the Quaker City Iron Works Company, $86,976, and his interest in the partnership trading as Quaker City Motor Parts Company, appraised at $123,635.25, or a total of $282,700.40, were all distributed in kind to the exceptants under an arrangement made among them. Only the interests of testator in the Quaker City Tank Company, Philadelphia Valve Company, and Quaker City Motor Parts Company, however, appear in the distribution account in the account of the executor now before us.

The stockholdings of testator in Quaker City Iron Works Company in the sum of $86,976 appear in the account as a sale at the inventory price. An item on the credit side of the principal account under date of January 25, 1938, indicates that the notes of testator to the Quaker City Iron Works are "satisfied". It is not upon the record, but counsel for exceptants stated, either

at the hearing or the argument, that exceptants had assumed these notes to the relief of the estate.

The executor claims commissions of $18,395.13, being five percent of $367,902.58, which latter represents the difference between the inventory value of the gross estate less life insurance policies payable to the estate and several other small items upon which no commission is claimed.

In 1923, testator made a will, naming as executor Provident Trust Company, which left substantially his entire estate in trust for his first wife and his daughters, with remainders over upon their decease. . . .

Neither Frederick C. Fuges, a member of the Philadelphia bar, who was counsel for testator for many years previous to his death, nor anyone at the Provident Trust Company, had knowledge of any will being made by testator between the date of the will of 1923, which was in the possession of Provident Trust Company and produced by it, and the date of the will of 1937, admitted to probate, which was prepared by Mr. Fuges.

Mr. William B. Bullock, who had been either trust officer or exercising some other function as an employe of Provident Trust Company for many years, had many discussions and conferences with testator and with testator's counsel, Mr. Fuges, as to testator's affairs, and knew, as did Mr. Fuges, that the then-existing will of testator contained trust provisions for the benefit of Minnie R. League, testator's first wife, and the three daughters. At that time the ages of the daughters were from 25 to 33 years, so that there was an expectancy that the trust would continue for approximately 30 years.

On December 12, 1932, Mr. Bullock, apparently in reply to a letter to him from Mr. Fuges under date of December 8th, wrote a letter to Mr. Fuges, wherein he refers to the controversy over the commissions in regard to the 1932 trust of Minnie R. League. He then states: "In order to avoid any future question, we should like at this time to go on record as to what our charges will

be should we act as executors of Mr. League's Estate. Our commission will be five percent on the principal, to be taken at the time of the filing of our executors' account and five percent on the income collected by us so long as the funds remain in our hands." He then suggests that Mr. Fuges take this matter up with Mr. League.

Mr. Fuges testifies that in compliance with this letter he took the matter up with Mr. League, the testator, who told him that it was entirely satisfactory and that he should so inform Mr. Bullock. In compliance therewith, Mr. Fuges, on December 14, 1932, wrote Mr. Bullock a letter in which he expressed satisfaction in Provident Trust Company's settlement of the matter of commissions as to the 1932 trust, and then states:

"I have taken up with Mr. League the commissions which you intend to charge as executor of his estate, to wit: five percent on principal at the time of filing your account as Executor, and five percent on income as collected, and he is perfectly satisfied therewith and you can accept this letter as his approval thereof.". . .

### Discussion

The court at the argument raised the question as to whether such a contract was not contrary to public policy in that it might tend toward inefficiency in administration of estates. This question has never been raised or discussed, much less decided, in any decision of the courts of Pennsylvania. The nearest approach to authority on this point is found in the *attitude* of the court in Sinnott's Estate, 231 Pa. 299, where such a contract was *assumed* by the court to be valid.

Our attention has been directed by counsel for accountant to only one decision in a foreign jurisdiction, which squarely held that such a contract or agreement was valid and enforcible. This case is In re McIntosh's Estate, 182 Iowa 23, 159 N. W. 223. We hold, therefore, that, as far as may be ascertained, the common opinion is that such

a contract is not contrary to sound policy, and is as effective as a similar regulation of commissions contained in a will.

We, therefore, examine the contract as any other contract to ascertain whether it has the qualifications and elements necessary to make it enforcible. That the contract was entered into appears to be clearly proven. There is first the written proposal by the representative of the accountant directed to the recognized and admitted counsel of decedent, in which are clearly stated the terms upon which the accountant will be executor of testator's will.

It plainly states as the terms, that accountant will perform all the functions of executor for a commission of five percent on the principal, to be received at the time of the filing of its executor's account, and five percent on income collected, so long as the estate remains in its hands.

Mr. Fuges, as requested in the letter stating the terms, conveyed the terms to Mr. League, decedent, and then replied to Mr. Bullock, the representative of the accountant, to the effect that his proposed terms were entirely satisfactory, restating the terms proposed by the accountant that there might be no misunderstanding. We have here, therefore, a clear proposal and a clear acceptance of terms, the consideration on the one hand moving from the accountant to testator being the services as executor, and the consideration moving from testator, to be paid after his death, out of his estate, being the five percent commission. It appears to have all the elements of a perfect contract, and for sufficient consideration.

Counsel have injected some features into the case upon which we will briefly comment. Exceptants argue that Mr. Fuges is represented as an agent of testator in the transaction but that his authority as agent has not been proven. There is no question of agency involved. Mr. Fuges received the communication from Mr. Bullock as the recognized legal counsel of testator, conveyed the mes-

sage to Mr. League, testator, and having received his reply to the message conveyed it on Mr. League's behalf to Mr. Bullock. There was no assumption of authority on the part of Mr. Fuges to act for Mr. League nor to exercise any discretion in acting for Mr. League in connection with his affairs. Mr. Fuges' sole function was to receive the proposal, communicate it to Mr. League, receive Mr. League's instructions as to the answer to the proposal and convey Mr. League's answer to the proposal to Mr. Bullock.

We are of the opinion that there was no question of agency and therefore no necessity of proof thereof.

Exceptants argue that when testator referred to his will in this agreement he did not mean the will which was probated and which was executed a short time previous to his death but referred to a former will in which he had set up trusts that would have run for a long period of time and justify a commission of five percent on the principal of his estate, his executor being also trustee and entitled to one commission for both services. Accountant argues that the evidence on the record shows that, with reference to the former trusts inter vivos in which the trust company was named trustee, the accountant had made concessions in one case as to the rate to be charged as commissions and in the other case where the trust was revoked accepting much less than they were entitled to under the terms of the trust, whereby testator in consideration of these concessions was only too glad to agree to the five percent commission on his estate to be paid accountant as executor. These two arguments are equiponderant and about cancel each other. Neither argument is decisive of this case nor should either argument be considered as affecting the decision. We have here a written instrument composed of these two letters which, as in the case of all written instruments, must be presumed to represent the final expression of the negotiations of the parties, and entered into for good and sufficient reasons best known to the respective parties. What the respective rea-

sons of the parties were which led them to finally enter into this clearly-expressed contract we need not seek to ascertain, much less go into their sufficiency if ascertained. If the reasons were sufficient to the parties it is no concern of counsel or of the court what they were or whether they were sufficient in our opinion. We have here a clearly-expressed contract between testator and the accountant with a good and sufficient consideration mutually moving to the parties and we can only hold that it is effective and must be performed.

Exceptants further argue that the five percent commission should not be calculated both upon the inventory value of the stock of the Quaker City Iron Works and the inventory of the value of the interest of testator in the partnerships, Quaker City Tank Company and Philadelphia Valve Company, because the valuation of the stock of the Quaker City Iron Works was based upon the note of testator being a part of its assets whereas this note was given for assets taken from the said corporation and put into these partnerships whereby it would cause a duplication of commissions to the extent of the amount of the note of testator to the Quaker City Iron Works in the sum of something over $45,000. With this argument we cannot agree. The note of testator was an asset of the Quaker City Iron Works without any qualification whatever and was properly considered as an asset when the inventory value was fixed. What testator did with the assets withdrawn for the amount of the note we are not concerned with. They may have been in the partnership at the time of his death and we have no reason to doubt exceptant's word to that effect. However, the court must take the valuation of the assets as they are found at the time of his death and in the form in which they then are because that represents the real value of the assets not only for purposes of calculating commissions but for every other purpose.

Exceptants further contend that the commission on the stocks in the sum of $34,450 pledged with Biddle, Whelen

& Company should not have the five percent commission imposed upon them but only upon the equity in the stocks above the amount necessary to pay the broker's loan which was $21,454.22. In this contention exceptants are justified. We cannot see that it makes any difference that Biddle, Whelen & Company as a matter of grace saw fit to consult accountant and give their opinion consideration as to the sale of the securities. This they were not required to do. The only part of these securities that actually came into the hands of the accountant was the difference between $34,450 and $21,454.22, and that alone is subject to the commission of five percent. To that extent the exception is sustained, but as to the remainder part of the commissions for which credit is taken it is dismissed.

*Julian W. Barnard, Edwin Booth,* and *Anthony G. Felix, Jr.,* for exceptants.

*High, Dettra & Swartz,* and *Frederick C. Fuges,* contra.

HOLLAND, P. J., November 25, 1940.—On August 17, 1940, the four residuary beneficiaries filed four exceptions, all of which may be considered together as they raise the objection to the award of five percent commission on principal to the accountant.

At the argument exceptants conceded that the contract between decedent and the accountant as to the commissions was a good and enforcible contract, and relied entirely on the argument that it applied to a former will existing at the time of making the contract and not to the last will made long after the contract.

We have examined the two writings constituting this contract and can find no language that refers to any particular will. The subject matter of the contract is the services of testator's executor. The only condition we can find is that accountant will receive five percent if it acts as testator's executor. Exceptants base the success of their contention on the language to the effect that the executor is to receive its commission on principal upon

the settlement of its executor's account, and five percent on income while the fund is in its hands, asking the court to infer that reference must have been to a will containing long-time trusts. Said language is as follows:

"In order to avoid any future question, we should like at this time to go on record as to what our charges will be should we act as executors of Mr. League's estate. Our commission will be five percent on the principal, to be taken at the time of the filing of our executors' account and five percent on the income collected by us so long as the funds remain in our hands."

It is true that this inference might be drawn, as it seems superfluous to state the time when the commissions are to be taken on principal, viz: "at the time of the filing of our executors' account." But then again it *might* infer that they are to be taken then rather than at some time during the period of administration. It *might* be inferred that "five percent on the income collected by us so long as the funds remain in our hands" means the time of a trust under which it is trustee. But then again it *might* refer to the period of its administration as executor during which it would have to collect income that fell due.

The difficulty is, the court would have to read into the contract that when the word "executor" was used in the proposal, it also meant "trustee", and that the executorship referred to was as to a specific will rather than as executorship of any will. The court cannot so reconstruct a written instrument. No reference can be found in the proposal contained in the letter of the trust company to Mr. Fuges, to a trust, to any particular will, or to any subject matter other than the office of executor.

Courts can only interpret the language contained in a written instrument, and cannot surmise as to the probable intention of a party when he used certain language. Furthermore, if testator understood the import of the agreement to be as contended by exceptants, he had more than eight months between the execution of his last will

and his death to cause accountant to revise it upon pain of not naming accountant as his executor.

We are of the opinion that the allowance of accountant's credit for its commissions by the auditing judge was just and proper, and his conclusions as to the controversy thereto sound.

And now, November 25, 1940, the four exceptions are dismissed, and the adjudication is confirmed absolutely.